# Staunton

E. D. English, Executor, etc. v. Elks' National Home,
et al.

September 21, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory
and Browning, JJ.

The opinion states the case.

*William Eubank* and *W. R. Saunders,* for the appellant.

*Nelson Sale,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

The Benevolent and Protective Order of Elks maintains in Bedford a home for its aged and indigent members. To this home James D. Ubil, then a member of Milwaukee, Wisconsin, Lodge No. 46, was admitted on January 1, 1925, and there remained until his death on January 1,

1929. The appraised value of his estate, which consisted of tangible and intangible personal property, was $8,915.15. This property, by will dated November 19, 1926, was bequeathed to testator's children, grandchildren and other relatives. The national home and the Milwaukee lodge presented claims against the estate, totalling some $1,840, for the support and maintenance of Ubil during the four years he was an inmate of the home. The executor filed a bill in which he alleged there were two or more claims against the estate, and being unadvised as to their validity he deemed it necessary to have accounts taken of the debts due and the estate settled under the direction of a court of equity. The case, in due course, was referred to a commissioner in chancery, who reported that the two claims mentioned were valid debts against the estate. To that report the executor filed exceptions, which were overruled by the chancellor. From a decree confirming the report this appeal was allowed.

The National Home of Elks is a charitable organization supported and maintained by members of the order for the benefit of members who are in indigent circumstances and incapable of earning a livelihood. The cost of the support and maintenance of the inmates is divided between the national order and the local lodge to which the inmate belongs, two-thirds being paid by the former and one-third by the latter. Before admission to the home, the applicant is required to sign an application, giving certain information concerning his mental, physical and financial condition. This is filed with the local lodge, which in turn appoints a committee to make investigation and report its finding to the lodge. If the application is approved by the local lodge all papers are sent to grand trustees, and if approved by them admission to the home follows.

In this instance, James D. Ubil filed the following application:

"ELKS' NATIONAL HOME

*"Application for Admission*

"October 20, 1924.

"Secretary, Milwaukee, Wis., Lodge, No. 46, B. P. O. Elks.

"Being in indigent circumstances and unable to earn a livelihood, I hereby make application for admission as a resident of the Elks' National Home, and submit as true the following statement as required by grand lodge laws: I was born at Lancaster, Pennsylvania, September 11, 1856, and am now sixty-eight years of age. I have been a member in good standing of the Benevolent and Protective Order of Elks for four continuous years immediately prior to the date of this application. My physical condition is (a complete statement is required) slightly deaf in one ear, slight rupture on right side, otherwise apparently healthy.

"I am able to attend to my daily wants without assistance."

The local lodge appointed a committee who reported favorably upon the application, in which report it is stated that they "propounded to applicant the following questions and submit his answers. * * *

"Have you any income? Yes. State amount and from what source derived. $140 per year from bond of Wisconsin Gas and Electric Co., seven per cent; $25 from sign site in West Allis, about $10 from Oil Inst. Have you any insurance? No."

The local lodge and the grand trustees approved the application and Ubil was admitted to the home on January 1, 1925, as above stated.

It is conceded that the cost of the support and maintenance of all inmates of the home is intended as a gift to them. There is no promise, expressed or implied, on their part to pay any part of this cost. The only reason advanced in this case for the presentation of the bill for the support and maintenance of Ubil is that shortly after his death the superintendent of the home ascertained

that at the time of his death he owned property valued at $8,915.15, and that a man owning this amount of property is not indigent within the meaning of that word as used in the constitution and by-laws of the order. In other words, it is claimed that when Ubil filed his application he made a false statement when he said that he was indigent, and that in failing to state the true value of his property he perpetrated a fraud upon his local lodge and upon the national home.

■ The case for the appellees turns upon the construction placed upon the term, "indigent circumstances," and whether or not there was a willful concealment of the true value of the decedent's property at the time he made his application for admission to the home. The definition of "indigent," according to Webster's New International Dictionary, is: "Destitute of property or means of comfortable subsistence; needy, poor, in want; necessitous." These are relative terms, and seem to have been so construed by the Elks' National Home. The superintendent of the home, in answer to the following question, testified:

"Q. At that time, what were the qualifications which were absolutely necessary and indispensable for a man to be admitted to the Elks' National Home?

"A. Under our law, which is printed on that application, section 65, a man must be adjudged indigent. At the time this man was taken in, I was a member of the board of grand trustees. In passing a man, it was always our policy not to take every nickel he had. In other words, if a man had something that would bring him a little money to spend, why it was not our policy to take that away from him. But if a man had sufficient income to maintain him away from the home, he would not be admitted."

It is conceded that Ubil truly disclosed the amount of his income, $175 per year, and the source from which it was derived, when requested so to do by the investigating committee of his local lodge. It seems, therefore, that

his financial condition at that time brought him within the superintendent's interpretation of the phrase, "indigent circumstances." It does not appear that Ubil was requested to ascertain the market value of his principal, or that the investigating committee was required to obtain this information; nor does the record contain any evidence tending to show the market value of the property in October, 1924, when his application for admission to the home was executed.

Numerous letters to Ubil from different attorneys disclose that between January, 1926, and May, 1927, he disposed of two pieces of his property. One was the sign site in West Allis, from which in 1924 he was deriving an income of $25 per year.. This seems to have been a vacant lot, for which he received $1,652.50, *i. e.*, $152.60 in cash and fifteen shares of stock in the Wisconsin Electric Power Company, valued at $1,500. The other property sold was an undivided one-half interest which he owned in a small tract of land in Texas. This property seems to have been in litigation for several years prior to its sale, and settlement for it was not received until January 6, 1927, at which time he received in cash and notes approximately $3,000. Whether or not this was income producing property does not appear. The inference is that this was the property referred to in the report of the investigating committee as "oil interest."

From this evidence it appears that in January, 1927, Ubil owned in cash and securities $6,652, while at the time of his death in January, 1929, he owned $8,915.15. No effort is made to account for the difference in the two sums. Whether the difference arose because of the increased value of his stock and securities, or whether it is accounted for by speculation, or otherwise, it is impossible to determine from the record. There is nothing in the extracts from the constitution, rules and regulations of the order filed in the record to show that any duty was imposed upon Ubil to disclose to either his local lodge or to the national home the value of his property

at the time he filed his application. There is no evidence tending to show that he did not fully inform the proper officers of the order the amount of his income and the source from which it was derived. It turned out, that after he had been an inmate of the home for more than a year he sold two pieces of property, from which he was deriving practically no revenue, for $4,652. Whether this non-income producing property had increased or decreased in value during that interval is not proven. This evidence is not sufficient to establish fraud, which is never presumed, but must be clearly and distinctly proven by clear, cogent and reliable evidence.

The appellees filed no petition or plea. They simply appeared before the commissioner when he was taking account of the debts due by the estate and filed an account charging the estate with the cost of maintenance and support of the decedent for the four years immediately preceding his death. They admit that at the time the expenditure for support and maintenance was made it was intended as a gift. R. A. Scott, superintendent of the national home, stated, in substance, that if it had been known the decedent owned property of the value shown in the appraisers' report he would not have been admitted to the home and the cost of maintenance and support would not have been incurred, but inasmuch as it was ascertained after his death that he owned sufficient property, if properly invested, to maintain him away from the home, the officers had decided to charge the estate with the cost of maintenance and support. The witness further stated that he did not know the value of the testator's property at the time his application for admission was made.

It is not shown that the superintendent lived in Wisconsin, or that he knew anything about Ubil before his application was presented to him as one of the grand trustees. Ubil lived in Milwaukee, Wisconsin, and had been for four years prior to the date of his application a member of Milwaukee Lodge, No. 46. The three men

who were appointed to investigate his financial worth were members of the same lodge, and it is very probable they were acquainted with him and his financial standing. If Ubil had perpetrated a fraud upon the order, or had failed to give all the information required, it seems that this fact would have been known to the members of the investigating committee, or other members of the Milwaukee Lodge, yet none of them were called to testify in this case.

In the final analysis, the case presented by the evidence for appellee is that at the time Ubil made application to be admitted to the home in 1924, he owned property from which he received the sum of $175 per year, the then market value of the property is not proven. On January 1, 1925, with a known income of $175 per year, he was admitted to the home as a member in "indigent" circumstances." By May, 1927, Ubil had converted his property into cash and securities worth $6,652. When he died in 1929 the appraised value of his property was $8,915.15. There was nothing in the constitution, rules and regulations of the order which imposed the duty upon him of disclosing the market value of his property at the time he filed his application, or of disclosing to the order the increase in value of his property after he had been admitted as an inmate of the home. See 28 R. C. L. 671, and supplement. See, also, note to *Carlson* v. *Krantz,* 54 A. L. R. 545, 561.

While it would seem that a sense of gratitude would impel a man possessed of nine thousand dollars to give first consideration to those who furnished him subsistence when he was not financially able to provide for himself, there were no rules of the order prior to September, 1930, which compelled an inmate, financially able, to reimburse the home for his support and maintenance.

For the reasons stated, the decree of the trial court is reversed, the exceptions to the commissioner's report sustained, and the case remanded.

*Reversed and remanded.*